**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
                                                              :
In re                                                         :       Chapter 11
                                                              :
CHINA FISHERY GROUP LIMITED                                   :       Case No. 16-11895 (JLG)
(CAYMAN), *et al.*,                                           :
                                                              :       (Jointly Administered)
              Debtors. [1]                                    :
                                                              :
------------------------------------------------------------- x
                                                              :
BURLINGTON LOAN MANAGEMENT DAC;                               :       Adv. Pro. No. _____
COWELL & LEE ASIA CREDIT                                      :
OPPORTUNITIES FUND; and HUTCH MASTER                          :
FUND LTD.,                                                    :       **COMPLAINT**
                                                              :
              Plaintiffs,                                     :
                                                              :
              v.                                              :
                                                              :
CHINA FISHERY GROUP LIMITED                                   :
(CAYMAN); CORPORACIÓN PESQUERA                                :
INCA S.A.C.; COÖPERATIEVE RABOBANK                            :
U.A., HONG KONG BRANCH, IN ITS                                :
CAPACITY AS PREDECESSOR AGENT;                                :
MADISON PACIFIC TRUST LIMITED, IN ITS                         :
CAPACITY AS SUCCESSOR AGENT; and CFG                          :
INVESTMENT S.A.C.,                                            :
                                                              :
              Defendants.                                     :
                                                              :
------------------------------------------------------------- x

---

[1]       The Debtors are China Fishery Group Limited (Cayman), Pacific Andes International Holdings Limited (Bermuda), N.S. Hong Investment (BVI) Limited, South Pacific Shipping Agency Limited (BVI), China Fisheries International Limited (Samoa), CFGL (Singapore) Private Limited, Chanery Investment Inc. (BVI), Champion Maritime Limited (BVI), Growing Management Limited (BVI), Target Shipping Limited (HK), Fortress Agents Limited (BVI), Ocean Expert International Limited (BVI), Protein Trading Limited (Samoa), CFG Peru Investments Pte. Limited (Singapore), Smart Group Limited (Cayman), Super Investment Limited (Cayman), Pacific Andes Resources Development Limited (Bermuda), Nouvelle Foods International Ltd., Golden Target Pacific Limited, Pacific Andes International Holdings (BVI) Limited, Zhonggang Fisheries Limited, Admired Agents Limited, Chiksano Management Limited, Clamford Holding Limited, Excel Concept Limited, Gain Star Management Limited, Grand Success Investment (Singapore) Private Limited, Hill Cosmos International Limited, Loyal Mark Holdings Limited, Metro Island International Limited, Mission Excel International Limited, Natprop Investments Limited, Pioneer Logistics Limited, Sea Capital International Limited, Shine Bright Management Limited, Superb Choice International Limited, and Toyama Holdings Limited (BVI).

Plaintiffs Burlington Loan Management DAC, Cowell & Lee Asia Credit Opportunities Fund, and Hutch Master Fund Ltd., holders or beneficial owners of more than 25% of the 9.75% Senior Notes due 2019 (the "Senior Notes") issued under that certain Indenture dated as of July 30, 2012 (as amended, restated, supplemented or otherwise modified, the "Indenture") by and among non-debtor CFG Investment S.A.C. ("CFGI") as the Company, debtor China Fishery Group Limited, as Parent Guarantor ("CFGL" or "Parent Guarantor"), Citicorp International Limited, as Trustee, and the Non-Russian Subsidiary Guarantors, by and through its undersigned counsel, hereby bring this action and in support thereof respectfully allege as follows:

## PRELIMINARY STATEMENT[1]

1.      This adversary proceeding seeks to remedy myriad long-standing breaches of the Indenture governing the Senior Notes and to ensure an equitable distribution of assets to creditors of the Peruvian OpCos (defined below), which represent the principal value of the Debtors' estate.

2.      In 2012, CFGI issued $300 million in Senior Notes predicated on explicit guarantees by CFGI's indirect parent CFGL and most of CFGL's subsidiaries (CFGL together with its subsidiaries, the "CF Group"). The protections afforded to holders of Senior Notes ("Noteholders") not only included the right to assert a direct claim against CFGL's primary operating subsidiary — CFGI — in the event of non-payment, but also assurances that the Senior Notes would rank at least *pari passu* with other unsecured debt of the CF Group. To ensure that the CF Group's subsequent acquisitions did not undermine these protections, the Indenture provided explicitly that future CFGL subsidiaries would independently guarantee the Senior Notes. The Indenture also placed strict limits on the CF Group's ability to incur additional debt to prevent diluting the Noteholders' claim against the CF Group.

---

[1]      Capitalized terms used but not defined in the Preliminary Statement are defined herein.

1

3.     In a knowing and deliberate breach of the Indenture, the CF Group wrongfully instructed a CFGL subsidiary — Corporación Pesquera Inca S.A.C. ("Copeinca") — to withhold the guarantee promised to Noteholders as part of a reprehensible bargain in which the CF Group abandoned its obligations to Noteholders as part of an improper *quid pro quo* with the administrative agent (the "Club Loan Agent") for a competing constituency of CF Group creditors, lenders under an unsecured $650 million Facility Agreement (the "Club Lenders").

4.     Less than two years after issuing the Senior Notes, the CF Group acquired Copeinca for 1.05 billion dollars, adding another valuable operating subsidiary to the CF Group. The CF Group's subsequent delisting of Copeinca stock triggered CFGL's obligation to procure a guarantee of the Senior Notes from its new subsidiary, Copeinca (the "Copeinca Guarantee"). Because the CF Group's obligation to cause Copeinca to guarantee the Senior Notes was unambiguous, the CF Group (at least initially) took steps to procure the Copeinca Guarantee, including removing all prior impediments, ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████.

5.     Commencing in or about February 2016, however, the Club Loan Agent implemented a scheme to deny Noteholders the Copeinca Guarantee and manufacture an artificially senior claim on the assets of the CF Group. Exploiting Copeinca's perilous financial condition at the time — and with full knowledge of Copeinca's obligation to guarantee the Senior Notes — the Club Loan Agent offered Copeinca additional working capital on the condition that Copeinca <u>not</u> guarantee the Senior Notes. The Club Loan Agent's actions intentionally induced

CFGL to breach its obligation under the Indenture to procure the Copeinca Guarantee and to otherwise prevent the CF Group from incurring debt.

6.      The CF Group operated CFGI and Copeinca (the "Peruvian OpCos") as a single, integrated business by and for the benefit of their ultimate parent CFGL (a holding company dependent on the operations of the OpCos) and the Ng family (who control the CF Group).  Ng Puay Yee ("Jessie Ng") (CEO of CFGL and legal representative of the Peruvian OpCos), Ng Joo Thieng ("J.T. Ng") (legal representative of the Peruvian OpCos), other members of the Ng family and individuals friendly to the Ng family (collectively, the "CF Group Representatives") acceded to the Club Loan Agent's demand, instructing Copeinca to enter into (and CFGI to guarantee) the Working Capital Facility in violation of the CF Group's obligations under the Indenture.  The CF Group's actions improperly purported to grant preferential treatment to one group of unsecured creditors (the Club Lenders) over another (Noteholders).

7.      In June 2016, CFGL and other Debtors filed for bankruptcy.  Because the value of the Debtors largely derives from the non-debtor Peruvian OpCos, the Debtors' ability to reorganize turns on the sale or other monetization of their direct and indirect equity interests in the Peruvian OpCos.  However, bids for the equity have been too low to satisfy in full the Peruvian OpCos' only third-party funded debt obligations:  the Senior Notes and Club Loan.

8.      CFGL's failure to procure the Copeinca Guarantee — a failure engineered in bad faith by the Club Loan Agent with the complicity of the CF Group — has enabled Club Lenders to lay claim to distributions from Copeinca that would and should be made on an equal and ratable basis to Noteholders.  For example, in January 2020, the Court entered an order permitting the Peruvian OpCos to make interim distributions of up to $75 million in cash to Noteholders and Club Lenders (the "Initial Distribution").  On account of Copeinca's purported guarantee of the

Club Loan but not the Senior Notes, the Club Lenders, which hold approximately 58% of the total unsecured debt outstanding, will — if the Initial Distribution is made — receive approximately 85% of the $75 million distribution. This windfall to the Club Lenders at the Noteholders' expense is the direct consequence of the Club Loan Agent's bad faith scheme to deny Noteholders their rights, assured in the Indenture, to equal and ratable treatment with respect to value from Copeinca.

9. Plaintiffs seek declaratory, equitable and injunctive relief to ensure that — consistent with the Indenture bargain and the CF Group's representations — the Noteholders receive their equitable (and contractually assured) share of any future distributions from the Peruvian OpCos. Plaintiffs also bring this action to redress the harm — including but not limited to any interest on lost distributions, legal fees, costs and expenses — caused by CFGL's and CFGI's breach of the Indenture and by the Club Loan Agent's tortious interference with the Indenture.

## PARTIES

10. Plaintiff Burlington Loan Management DAC ("Burlington") is a corporation incorporated in Ireland. Burlington is the beneficial owner of $65,571,000 face amount of Senior Notes.

11. Plaintiff Cowell & Lee Asia Credit Opportunities Fund ("Cowell & Lee") is a Cayman Islands offshore fund managed by Cowell & Lee Capital Management Ltd., a Hong Kong Special Administrative Region of the People's Republic of China ("Hong Kong") company. Cowell & Lee is the beneficial owner of $47,282,000 face amount of Senior Notes.

12. Plaintiff Hutch Master Fund Ltd. ("Hutch") is a Cayman Islands company and master fund in a master-feeder hedge fund structure. Hutch is the beneficial owner of $5,810,000 face amount of Senior Notes.

4

13.     Defendant CFGL is a public company incorporated in the Cayman Islands with a principal place of business in Hong Kong.

14.     Defendant Copeinca is a corporation incorporated and with a principal place of business in Peru.

15.     Defendant Coöperatieve Rabobank U.A., Hong Kong Branch ("Rabobank"), the original Club Loan Agent, is a banking entity incorporated and with a principal place of business in the Netherlands.

16.     Defendant Madison Pacific Trust Limited ("Madison Pacific"), the successor to the original Club Loan Agent, is a trust corporation registered under Hong Kong law.

17.     Defendant CFGI is a corporation incorporated and with a principal place of business in Peru.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1409(a).

19.     On June 30, 2016, certain Debtors filed voluntary petitions with the United States Bankruptcy Court for the Southern District of New York (the "Court") for relief under chapter 11 of the Bankruptcy Code.  Thereafter, between September 29, 2016 and May 2, 2017, the remaining Debtors filed voluntary petitions with the Court for relief under chapter 11 of the Bankruptcy Code. On July 14, 2016, the Court entered an order consolidating the chapter 11 cases (together, the "Chapter 11 Cases") under the caption *In re China Fishery Group Limited (Cayman)*, Case No. 16-11895.  The Chapter 11 Cases remain pending.

5

20.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O).  To the extent that any claim is non-core, Plaintiffs consent to the entry of a final Order by this Court with respect to all counts in this Complaint.

## FACTUAL ALLEGATIONS

### I.    The CF Group

21.     The CF Group is one of the world's largest producers and suppliers of fishmeal and fish oil through its fishing and processing operations located along the coast of Peru.  The CF Group operates as a separate business within the larger Pacific Andes group of companies, which at one time comprised the twelfth largest fishing company in the world.  The business was founded and is controlled by members of the Ng family, who control the CF Group's operations through their control of the ultimate, indirect parent of CFGL.  Members of the Ng family hold director and chief executive positions at many entities in the CF Group, including CFGL and the Peruvian OpCos.  For example, Jessie Ng is the CEO of CFGL, a legal representative of the Peruvian OpCos, and a director at each of the initial Debtors in these Chapter 11 Cases.  Her brother Ng Joo Kwee is the chairman of CFGL.  Their brother J.T. Ng, is a general manager at the Peruvian OpCos.  Their brother Ng Joo Puay ("Frank Ng") is a legal representative of the Peruvian OpCos.

22.     CFGL, the ultimate parent of the CF Group, is a holding company that depends on the business operations of its subsidiaries to function.  CFGL's value is largely derived from its primary operating subsidiaries, the Peruvian OpCos, which are engaged in the business of anchovy fishing, and fishmeal and fish oil production in Peru for worldwide distribution.

23.     Initially, CFGI was the CF Group's primary operating subsidiary in Peru.  In 2013, the CF Group acquired Copeinca AS (f/k/a Copeinca ASA) and its subsidiaries (collectively, the "Copeinca Entities").  Copeinca is the operating company of the Copeinca Entities, and was, prior to the CF Group acquisition, a competitor of CFGI.  Following the transfer of ownership of the

Copeinca Entities to CFGI, the ownership structure of certain relevant entities in the CF Group was as follows:



24.     Acquiring Copeinca enabled the CF Group to control the single largest block of the national quota for the harvest of anchovy in Peru, increase the CF Group's fishmeal operations, and achieve synergies between the common business enterprises of CFGI and Copeinca. Following the acquisition of Copeinca in 2013, the operations of the Peruvian OpCos were consolidated into one integrated business, run as a single enterprise with a unity of interest by identical management under the control of the Ng family.

## II.     **The Peruvian OpCos**

25.     The Peruvian OpCos have no boards of directors.  Instead, general managers and legal representatives hold certain corporate governance powers, while other matters must be approved by shareholders with voting rights at a shareholder meeting.  The Peruvian OpCos share the same general managers and legal representatives:  Francisco Javier Paniagua Jara ("Paniagua"), Jose Miguel Tirado Melgar ("Tirado"), J.T. Ng, Jessie Ng, and Frank Ng.  Each of these individuals are either members of the Ng family or, in the case of Paniagua and Tirado, designees of the Ng family.

26.     Paniagua, Tirado and J.T. Ng have been general managers of CFGI since its incorporation in June 2006.  Since September 2013, Paniagua has been a legal representative and Tirado has been a general manager of Copeinca.  J.T. Ng has been a general manager of Copeinca since February 2016.  Frank Ng has been a legal representative of CFGI ████████ and later became a legal representative of Copeinca.  Jessie Ng became a legal representative of the Peruvian OpCos in 2016.  Neither CFGI nor Copeinca has a board member, general manager, or legal representative that is distinct from the other or is independent of the Ng Family.

27.     The shareholders of the Peruvian OpCos also are controlled by the Ng family. Shareholder CFG Peru Singapore — among the Debtors in these Chapter 11 Cases — was, prior to the appointment of the Chapter 11 Trustee, run by a board of directors populated by Ng family members or individuals associated with them, including Jessie Ng, ██████████████. Shareholder Copeinca Internacional S.A. is run by directors ██████████████.  Shareholder Copeinca AS is run by ████████████████████████.

28.     Shareholder meetings for the Peruvian OpCos ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████.

29.     Paniagua and Tirado manage the day-to-day operations of the Peruvian OpCos (at the direction of the Ng Family) including supervising the OpCos' approximately 2,400 employees, managing relationships with local suppliers, negotiating with local inventory and working capital financiers for funding, and interacting with local authorities and other industry stakeholders.

8

30.     J.T. Ng and Jessie Ng run the Peruvian OpCos' global sale of fishmeal, in particular sales to China, which is the market with the largest demand for fishmeal.  J.T. Ng and Jessie Ng are responsible for developing sales and marketing strategies for the Peruvian OpCos.

31.     The Peruvian OpCos share a common senior level management team providing legal, administrative, managing, accounting and IT services to both companies.   Copeinca personnel perform ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████.  The financial department for Copeinca also ███████████ ████████████████████████.

32.     The integration of the Peruvian OpCos extends beyond identical decision-makers and overlapping personnel.   The Peruvian OpCos share common office space at the same headquarters located at Calle Francisco Graña St. No. 155, Urb. Santa Catalina, La Victoria, Lima, Peru.  The Peruvian OpCos regularly ██████████████████████████████████████████ ████.  The Peruvian OpCos are marketed in their common geographic markets ████████████ ██████████████████████████.  The Peruvian OpCos routinely cross-utilize each other's processing plants, with vessels utilizing the closest available plant to maintain the freshness and quality of the catch and reduce operating costs.  Paniagua is the general manager for the Peruvian OpCos, but ██████████████████████████.  The Peruvian OpCos have shared ████████████████████████.  The Peruvian OpCos have, in the past, commingled cash with Copeinca acting as treasurer.  The Peruvian OpCos have issued guarantees of certain of each other's debt obligations.  ██████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████.

33.    Marketing materials for the Peruvian OpCos ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████

34.    In sum, the management, operation and corporate affairs of CFGI and Copeinca are

so thoroughly intermingled that each of the Peruvian OpCos lacks a separate identity.

### III.    CFGI Issues Senior Notes Guaranteed by CFGL, The Subsidiary Guarantors, and Future CFGL Subsidiaries

35.    On July 30, 2012, CFGI issued the Senior Notes pursuant to the Indenture.  CFGL,

as Parent Guarantor, guaranteed repayment.  Numerous CFGL subsidiaries existing at that time,

including CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore") and China

Fisheries International Limited (Samoa) ("CFIL"), also guaranteed payment of the Senior Notes

as Subsidiary Guarantors.  Under the Indenture, the Senior Notes must rank, at a minimum, *pari

passu* with all unsecured debt of CFGI and the guarantors, including CFGL.

36.    Pursuant to the Indenture, CFGL as Parent Guarantor pledged, as further guarantee

for repayment of the Senior Notes, to secure a guarantee from any subsidiaries acquired in the

future to the extent that CFGL owned, directly or indirectly, more than 80% of the voting stock of

that subsidiary, so long as the subsidiary's voting stock was not listed on a stock exchange.

37.    Specifically, Section 11.09(a) of the Indenture provides that:

[T]he Parent Guarantor will cause each of its future Restricted Subsidiaries of
which the Parent Guarantor, the Company [*i.e.*, CFGI] or a Subsidiary Guarantor
owns directly or indirectly more than 80% of the Voting Stock (. . . other than any
Restricted Subsidiary the Voting Stock of which is listed on a stock exchange) . . .
, promptly upon the Parent Guarantor, the Company or a Subsidiary Guarantor
owning directly or indirectly more than 80% of the Voting Stock of such Restricted

10

Subsidiary to execute and deliver to the Trustee a supplemental indenture to this
Indenture . . . pursuant to which such Subsidiary or Subsidiaries will guarantee the
payment of the [Senior] Notes and this Indenture.

Under the Indenture, each subsidiary of CFGL is a "Restricted Subsidiary" by default. The Board

of Directors may only change a subsidiary's designation to "Unrestricted" if certain narrow

conditions are met, including that the subsidiary does not own any material license or right used

in connection with the operation of any part of the CF Group's business.

38.    Under Section 11.09(d) of the Indenture, "upon execution of the applicable

supplemental indenture to this Indenture," "[e]ach Restricted Subsidiary that guarantees the

[Senior] Notes after the Original Issue Date . . . will become a 'Subsidiary Guarantor' for purposes

of this Indenture and the Notes." A form of supplemental indenture was annexed as Exhibit I to

the Indenture.

39.    When marketing the Senior Notes, CFGL represented that future subsidiaries of

CFGL — *i.e.*, future acquisitions by the CF Group funded by the Senior Notes in whole or in part

— would also guarantee the Senior Notes. In the Offering Memorandum for the Senior Notes,

CFGL stated that the Senior Notes are guaranteed by "certain future subsidiaries" of CFGL. CFGL

further stated that it "will cause each of its future Restricted Subsidiaries" to promptly guarantee

the payment of the Senior Notes upon CFGL owning, directly or indirectly, more than 80% of that

subsidiary's voting stock (provided that the voting stock is not listed on a stock exchange).

40.    Because the Parent Guarantor had few assets beyond its indirect interest in the

issuer, CFGI, this promise was an essential component of the bargain by which the Senior Notes

were offered to investors. As CFGL represented in the Offering Memorandum for the Senior

Notes, CFGL recently had acquired three new subsidiaries and a "principal component[]" of

CFGL's business strategy was "to explore, evaluate and pursue future acquisition opportunities . .

11

. .'' Without the guarantees of future subsidiaries, CFGI could not have issued the Senior Notes on the same economic terms, if at all, in light of the risk of value leakage to new subsidiaries.

41.     As further protection of the right to repayment of the Senior Notes, Section 4.06 of the Indenture strictly limits the ability of CFGL and its subsidiaries to incur indebtedness.  CFGL, CFGI, and Subsidiary Guarantors may not incur indebtedness unless the indebtedness falls within narrowly defined categories of "Permitted Indebtedness" or the CF Group is able to satisfy a certain financial ratio after giving effect to the indebtedness.

42.     Further, Section 4.12(a) of the Indenture provides that, unless and until a Restricted Subsidiary executes a supplemental indenture guaranteeing the Senior Notes, the Parent Guarantor will not permit the Restricted Subsidiary to guarantee any indebtedness of CFGL or any other Restricted Subsidiary.

43.     The Indenture is governed by New York law.  Under the Indenture, CFGI, CFGL and the Non-Russian Subsidiary Guarantors agreed to submit to the jurisdiction of any U.S. federal or New York state court located in Manhattan for proceedings related to the Indenture.

## IV.     The Copeinca Guarantee and the Club Loan Agreement

44.     In 2013, approximately one year after the issuance of the Senior Notes, a CFGL subsidiary acquired the Copeinca Entities for approximately $1.044 billion.  Specifically, CFGL's indirect wholly-owned subsidiary acquired over 99% of the voting rights in Copeinca AS.  The acquisition price consisted of a cash price of $794 million and the assumption of $250 million of existing 9.0% notes due 2017 issued by Copeinca (the "Copeinca Notes").

45.     As noted above, the Senior Notes Indenture obligates CFGL to obtain a guarantee from any Restricted Subsidiary once it directly or indirectly owns over 80% of the subsidiary's voting stock and the stock is not listed on a stock exchange.  Following the 2013 acquisition, the Copeinca Entities qualified as a Restricted Subsidiaries and CFGL indirectly owned over 99% of

their voting stock.  At the time of the acquisition, however, shares of Copeinca AS were listed on the Oslo stock exchange, with a secondary listing on the Lima stock exchange.

46.    On March 21, 2014, the CF Group completed a compulsory acquisition of the remaining shares of Copeinca AS for approximately $7 million and 100% of the shares were transferred to CFGI.  Thereafter, in April 2014, the stock of Copeinca AS was delisted from the Oslo and Lima stock exchanges.   When Copeinca AS's stock was delisted in April 2014, the final condition for CFGL's obligation to cause the Copeinca Entities to execute a supplement indenture guaranteeing the Senior Notes was met.  The Noteholders have therefore been entitled to the Copeinca Guarantee since at least April 2014.

47.    Contemporaneous with the CF Group completing its acquisition of the Copeinca Entities, the CF Group entered into a loan facility.  On March 20, 2014, CFIL, CFGI and Copeinca, as borrowers and guarantors, and CFGL, as guarantor, entered into an unsecured $650 million Facility Agreement (as amended from time to time, the "Club Loan Agreement") with the lenders from time to time party thereto.  From 2014 until 2020, the Club Loan Agent was Rabobank, when it was replaced by its successor-in-interest, Madison Pacific.  Pursuant to the terms of the Club Loan Agreement, Copeinca's obligations as borrower and guarantor did not become effective until after the redemption of the Copeinca Notes.  Because Copeinca qualified as a Restricted Subsidiary under the Indenture, Section 4.12(a) of the Indenture prohibited Copeinca from guaranteeing the Club Loans unless and until it executed a supplemental indenture guaranteeing the Senior Notes.

**V.    The CF Group Works to Procure the Copeinca Guarantee**

48.    Because the obligation to provide the Copeinca Guarantee was obvious and unambiguous, both CFGL and the Peruvian OpCos endeavored to provide the Copeinca Guarantee, at least initially.  For nearly a year, the CF Group worked to remove obstacles

13

preventing Copeinca from issuing the Copeinca Guarantee, including covenants in the Indenture for the Copeinca Notes restricting Copeinca's ability to incur new indebtedness.

49.     The CF Group sought the consent of Copeinca Noteholders to issue the Copeinca Guarantee and offered, in exchange, guarantees of the Copeinca Notes from CFGI, CFGL and other CF Group entities. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████.

50.     ███████████████████████████████████████████████████

███████████████████ Copeinca issued the consent solicitation to Copeinca Noteholders on July 17, 2014.  However, efforts to secure the consent of Copeinca Noteholders over the next several months failed.  On May 11, 2015, Copeinca redeemed the Copeinca Notes with funds raised in a CFGL rights offering.

51.     Redemption of the Copeinca Notes purported to render Copeinca's guarantee of the Club Loan effective under the terms of the Club Loan Agreement.  This breached Section 4.12(a) of the Indenture, however, which precluded any Restricted Subsidiary of the CF Group (*i.e.*, Copeinca) from guaranteeing indebtedness of the CF Group before executing a supplemental indenture guaranteeing the Notes.  This breach created an artificial disparity between Noteholders and Club Lenders with respect to the obligations of the Peruvian OpCos that was prohibited under the Indenture and should have been cured immediately by issuance of the Copeinca Guarantee.

52.     In August 2015, the CF Group again undertook ███████████████████

███████████████████████████████████████████. Among other things,

the Peruvian OpCos prepared ██████████████████████████████████████████

███████████████████████.

53.     However, for reasons that will be revealed in discovery, Citicorp International

Limited was, on information and belief, unwilling to act as indenture trustee with Copeinca as a

guarantor.  In January 2016, TMF Trustee Limited was appointed to replace Citicorp International

Limited.

54.     In the agreement appointing TMF Trustee Limited as the successor indenture

trustee, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████.

## VI.     The Club Loan Agent Willfully Induces
## CFGL to Breach the Indenture Without Justification

55.     The Club Loan Agent, by virtue of its discussions with representatives of

Copeinca, CFGL and the CF Group, knew and understood that CFGL was obligated to procure the

Copeinca Guarantee under the Indenture.  The Club Loan Agent nonetheless took deliberate steps

to block the issuance of the guarantee to benefit the Club Loan Agent (who was also a Club Lender)

and other Club Lenders at the expense of Noteholders.

56.     By late 2015, the CF Group was facing obvious financial difficulties.  Revenues

had declined as a result of a diminution in fish stock related to the effects of El Niño, which

disrupted the 2014-2016 fishing seasons.  The CF Group began to default on required payments to

Club Lenders beginning in September 2015, then failed to make a required $14,625,000 interest

payment to Noteholders on January 30, 2016.  In November 2015, joint provisional liquidators ("JPLs") were appointed over CFGL and CFIL.  Although the JPLs were dismissed in January 2016, CFGL and CFIL entered into a deed of undertaking providing for the immediate reappointment of the JPLs if, among other things, a sale of the Peruvian OpCos did not occur by July 15, 2016.  In November and December 2015, the Peruvian OpCos' primary working capital provider suspended a $100 million credit line and two other local banks suspended their facilities.  As a result, the Peruvian OpCos lacked sufficient funds to commence the 2016 fishing season.

57.    The Club Loan Agent exploited Copeinca's need for financing to prevent Copeinca from guaranteeing the Senior Notes and unjustly captured Noteholders' right to payment from Copeinca for the benefit of Club Lenders.  From February through April 2016, the Club Loan Agent negotiated a $25,550,000 short-term working capital facility (the "Working Capital Facility") provided by nearly all Club Lenders to fund Copeinca's fishing season.  The Club Loan Agent conditioned this funding, however, on Copeinca's agreement not to issue the Copeinca Guarantee; *i.e.,* to breach the Senior Notes Indenture.  The Club Loan Agent further interfered with Noteholders' rights by inducing CFGI and CFG Peru Singapore to guarantee the Working Capital Facility in breach of the Indenture.

58.    The CF Group Representatives knew and understood that the Peruvian OpCos could not assume additional indebtedness under the Indenture without first obtaining the consent of the Noteholders, and that Copeinca remained obligated to guarantee the Senior Notes.  The CF Group Representatives nevertheless caused CFGL and CFGI to breach their obligations in a wrongful effort to ensure the continued flow of value from the Peruvian OpCos to the CF Group as a whole.

16

A.    **The Working Capital Facility**

59.    The executed Facility Letter between Copeinca and the Club Loan Agent governing the Working Capital Facility included a provision that, as a practical matter, barred Copeinca from issuing the Copeinca Guarantee.   Specifically, paragraph 14(i) requires that Copeinca, as Borrower, provide the Club Loan Agent, as Lender:

> no later than 60 days after the date of this Facility Letter, evidence that the shareholders meeting of the Borrower has considered whether the accession of the Borrower as a "Subsidiary Guarantor" under and in accordance with the terms of the indenture dated 30 July 2012 between, among others, CFG Investment S.A.C. and China Fishery Group Limited ("Indenture") would be in the best interests of the Borrower (including a consideration as to tangible benefits to the Borrower) and either (1) evidence that the Borrower has acceded to the Indenture as a "Subsidiary Guarantor" on terms to be agreed between the Borrower and the Lender including, without limitation, the subordination of all amounts owing under or in respect of the Indenture to this Facility Letter; or (2) confirmation that following such considerations the shareholders have decided that, for reasons set out in such confirmation, they were unable to approve the accession of the Borrower as a "Subsidiary Guarantor."

60.    The provision required Copeinca to demonstrate within sixty days that Copeinca shareholders held a meeting to consider whether it is "in the best interests of [Copeinca] (including a consideration as to the tangible benefits to [Copeinca])" to agree to become a Subsidiary Guarantor under the Indenture.

61.    After considering whether guaranteeing the Senior Notes would provide "tangible benefits" to Copeinca, Copeinca then had two options.  First, Copeinca could confirm that the shareholders had decided that Copeinca would not become a Subsidiary Guarantor.  Second, Copeinca could agree to become a Subsidiary Guarantor, but only "on such terms to be agreed between" Copeinca and the Club Loan Agent, "including, without limitation, the subordination of all amounts owing under or in respect of the Indenture to this Facility Letter . . . ."

17

62.     This extraordinary provision in the Facility Letter assured that CFGL would breach the Indenture by either:  (i) not issuing the Copeinca Guarantee; or (ii) permitting the Club Loan Agent to dictate the terms, if any, on which Copeinca would issue the Copeinca Guarantee.  ██████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████.

63.     The Working Capital Facility also breached the restrictions in the Indenture on the incurrence of indebtedness.  First, CFGL breached the Indenture by permitting Copeinca — as a Restricted Subsidiary that had not guaranteed the Senior Notes — to incur additional indebtedness.  Second, the Facility Letter required, as a condition subsequent, that Copeinca obtain guarantees of the Facility Letter from CFGI and CFG Peru Singapore.  These guarantees did not fall within the narrowly defined categories of Permitted Indebtedness under the Indenture and therefore breached CFGL's obligation to prevent the incurrence of indebtedness.

64.     Through the guarantee, the Club Loan Agent obtained rights against CFG Peru Singapore (an entity that is not an obligor of the Club Loan).  As the direct owner of equity in CFGI, these rights provided the Club Loan Agent and Club Lenders a path to appoint liquidators over CFG Peru Singapore in the Singapore courts and control the Peruvian OpCo sale process.

**B.      Negotiation of the Working Capital Facility**

65.     In early 2016, CFGL appointed Paul Brough as chief restructuring officer.  Brough, together with Jessie Ng (the CEO of CFGL and a legal representative of the Peruvian OpCos) negotiated the Working Capital Facility with the Club Loan Agent.

66.     At the same time, Brough negotiated with an *ad hoc* group of Noteholders (the "Senior Noteholder Committee") represented by Kirkland & Ellis ("Kirkland") in the hopes of

18

obtaining their consent to forbear from taking enforcement action given that the Working Capital

Facility would breach restrictions in the Indenture on the incurrence of indebtedness.

67.    The Senior Noteholder Committee offered to consent to the incurrence of

indebtedness — *i.e.*, accept a modification of the Indenture to their detriment — but only if CFGL

complied with its fundamental and long-standing contractual obligation to procure the Copeinca

Guarantee. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

68.    ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

69.    That same day (March 10, 2016), ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

70.    Negotiations ensued for months, ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



71.    In light of the continued failure to procure the Copeinca Guarantee, Kirkland sent a letter to the Club Lenders about possible legal action.  On March 24, 2016, Jessie Ng asked Brough if the Kirkland letter would change the Club Lenders' minds about providing the Working Capital Facility.  Brough responded, "I don't think so.  Their only concern was that they didn't want to be seen to encourage us to breach the note indenture."

72.

73.                                                          , Copeinca (as directed by Jessie Ng and other CF Group Representatives) entered into the Working Capital Facility despite knowing it would cause Copeinca's parent-affiliate, CFGL, to breach the Indenture.  Indeed, Brough cautioned Jessie Ng that "[t]he CF board needs to be careful though which is why detailed minutes have been prepared by Ashurst," external legal counsel for several CF Group entities.  Jessie Ng responded, "We did seek legal opinion about the guarantee so at least we can use that."

74.     As explained above, the CF Group Representatives treated the Peruvian OpCos as a single, integrated business for the purposes of conducting day-to-day business and garnering revenue to support the CF Group as a whole.  Continuing this trend, the CF Group Representatives negotiated and caused Copeinca to enter into the Working Capital Facility to obtain necessary funding for the Peruvian OpCos for the benefit of the CF Group.

75.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████

76.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

77.     On April 5, 2016, CF Group Representatives Jessie Ng and J.T. Ng executed the Working Capital Facility and CFGI guarantee, respectively, without Noteholder consent and without issuing the Copeinca Guarantee.

78.     The money drawn down from the Working Capital Facility was used by the Peruvian OpCos — *i.e.*, both Copeinca and CFGI — to make emergency payments, including overdue taxes and amounts over 6-months overdue to suppliers, and profit-sharing payments to employees to avoid a possible strike.

## VII.    The Bankruptcy Proceedings and Harm to Noteholders

79.    On June 8, 2016, money drawn down from the Working Capital Facility was repaid from a refund of value-added tax incurred from the Peruvian OpCos' sale of fishmeal.  Copeinca, CFGI and the other guarantors of the Working Capital Facility purportedly remain obligated on over $1.1 million in costs and expenses, including attorney's fees, incurred by the Club Loan Agent in negotiating the facility.

80.    Thereafter, CFGL, the Peruvian OpCos, and other affiliated entities began preparing for coordinated global filings for bankruptcy protection.  On June 30, 2016, creditors friendly to the Ng family initiated involuntary insolvency proceedings in Peru against the Peruvian OpCos and the Peruvian OpCos filed petitions for recognition of a foreign proceeding under chapter 15 of the Bankruptcy Code in this Court.  On September 30, 2016, the Peruvian OpCos commenced voluntary insolvency proceedings in Peru.

81.    Also on June 30, 2016, certain of the Debtors in the above-captioned cases filed petitions under chapter 11 of the Bankruptcy Code.  Thereafter, between September 29, 2016 and May 2, 2017, the remaining Debtors filed chapter 11 petitions.

82.    The commencement of these bankruptcy proceedings caused another default under the Indenture, compounding the January 2016 payment default, among others.  On July 8, 2016, TMF Trustee Limited, as successor indenture trustee, sent a letter to CFGI providing notice of an event of default under the Indenture and accelerating all principal payments and interest.  Amounts due and owing on the Senior Notes remain outstanding.

83.    On October 28, 2016, the Court appointed a trustee solely for CFG Peru Singapore (the "Chapter 11 Trustee").  The Chapter 11 Trustee obtained the dismissal of the various insolvency proceedings with respect to the Peruvian OpCos, but also obtained an injunction

22

preventing Noteholders and Club Lenders from pursuing collection actions against the Peruvian

OpCos in Peru.

84.     Recognizing that the value of the Debtors is largely derived from the Peruvian

OpCos, the Court instructed the Chapter 11 Trustee "to assess the highest and best use of" CFG

Peru Singapore's interests in the Peruvian OpCos to resolve the Chapter 11 Cases.  Monetization

of these equity interests depends, in substantial part, on how funds are to be distributed from the

Peruvian OpCos to satisfy debt obligations to Noteholders and Club Lenders—the only third-party

debt of the Peruvian OpCos.

85.     In January 2020, the Court entered an order permitting the Peruvian OpCos to make

the Initial Distribution of up to $75 million in cash to Noteholders and Club Lenders, *without

prejudice* to the appropriate allocation between the Noteholders and Club Lenders as it relates to

future distributions.  Although the Club Lenders constitute approximately 58% of the total

unsecured debt outstanding, they would receive approximately 85% of the Initial Distribution

whereas Noteholders, who constitute approximately 42% of the outstanding debt, would receive

only 15% of the Initial Distribution—all on account of the absence of a Copeinca Guarantee that

CFGL was obligated to provide but failed to do so as a direct consequence of misconduct by the

Club Loan Agent.

86.     CFGL's failure to procure the Copeinca Guarantee, at the instigation of the Club

Loan Agent, has enabled Club Lenders to claim a distribution preference over Noteholders from

Copeinca where no such preference can or should exist.  Noteholders have already been damaged

by these failures in the form of cost and attorneys' fees incurred in remedying these breaches, and

by any lost interest or lost payments from the Initial Distribution.  Unless the Copeinca Guarantee

is issued — or the equivalent declaratory or injunctive relief is granted — Noteholders will suffer

substantial and potentially irreparable damage from preferential distributions the Club Lenders, vis-à-vis the Noteholders, from the Peruvian OpCos.

87.      The Chapter 11 Trustee assured the Court for years that proceeds from a sale of equity in CFGI would be sufficient to repay Noteholders and the Club Lenders in full, but more recently indicated that proceeds from a sale may be insufficient to provide a full recovery.  Indeed, the Trustee's report to the Court on May 22, 2020 advised that no purchaser has surfaced and the COVID-19 pandemic has caused reduced productivity and uncertainty such that the Initial Distribution would not be made.  The declaratory and injunctive relief sought herein is therefore all the more crucial to ensure that distributions from the Peruvian OpCos — including the allocation of value in connection with any plan of reorganization and monetization of CFG Peru Singapore's equity in CFGI — are made equitably and ratably to Noteholders and Club Lenders.

## FIRST CAUSE OF ACTION

### Breach of Contract Against CFGL and CFGI

88.      Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

89.      The Indenture is a valid, binding, and enforceable contract.

90.      CFGL and CFGI are bound by the terms of the Indenture.

91.      Section 11.01(a) of the Indenture requires CFGL to procure the Copeinca Guarantee.

92.      CFGL breached the Indenture by failing to procure the Copeinca Guarantee.

93.      CFGI, as the issuer of the Senior Notes and a party to the Indenture, is liable for the failure to satisfy the contractual obligation to have Copeinca guarantee the Senior Notes.

94.      Plaintiffs have performed all conditions, covenants, and promises necessary to commence this action.

95.     Plaintiffs have suffered and will continue to suffer damages as a direct result of
CFGL's and CFGI's breach.

96.     Plaintiffs are entitled to damages in an amount to be determined at trial.

97.     There is no adequate remedy at law, however, for the ongoing breach of the
Indenture.   Monetary damages against CFGL and CFGI would fail to afford complete justice
because there is no prospect of CFGL having any distributable assets in its bankruptcy case to
satisfy a judgment for breach of contract and because there is no prospect that CFGI could satisfy
an award in full.  Further, the monetary damages caused by CFGL's and CFGI's breaches would
be difficult to quantify.

98.     Accordingly, Plaintiffs also are entitled to an order granting specific performance
of CFGL's and CFGI's obligation to procure the Copeinca Guarantee in compliance with Section
11.01(a) of the Indenture and any and all additional or alternative remedies in equity or law that
the Court deems just and proper.[2]

## SECOND CAUSE OF ACTION

### Breach of Contract Against CFGL and CFGI

99.     Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth
herein.

100.    The Indenture is a valid, binding, and enforceable contract.

101.    CFGL and CFGI are bound by the terms of the Indenture.

102.    Section 4.12(a) of the Indenture provides that, unless and until a Restricted

---

[2]     CFGL and CFGI have the authority and ability to perform the obligation under Section 11.01(a) of the
Indenture to procure the Copeinca Guarantee.  For example, CFGL can vote its 100% shares in Smart Group Limited
(Cayman); Smart Group Limited (Cayman) can vote its 100% shares in CFG Peru Singapore; the Chapter 11 Trustee,
as CFG Peru Singapore's representative in its capacity as shareholder at CFGI, can vote its 100% shares in CFGI;
CFGI can vote its 100% shares in Copeinca AS; Copeinca AS can vote its 100% shares in Copeinca Internacional
S.A.; and Copeinca AS and Copeinca Internacional can vote their combined 100% shares in Copeinca.

Subsidiary executes a supplemental indenture guaranteeing the Senior Notes, the Parent Guarantor will not permit the Restricted Subsidiary to guarantee any indebtedness of CFGL, CFGI or any other Restricted Subsidiary.

103.    CFGL breached the Indenture by failing to prevent Copeinca from guaranteeing the Club Loan.

104.    CFGI, as the issuer of the Senior Notes and a party to the Indenture, is liable for the failure to prevent Copeinca from guaranteeing the Club Loan.

105.    Plaintiffs have performed all conditions, covenants, and promises necessary to commence this action.

106.    Plaintiffs have suffered and will continue to suffer damages as a direct result of CFGL's and CFGI's breach.

107.    Plaintiffs are entitled to damages in an amount to be determined at trial.

108.    In addition to damages incurred to date, Plaintiffs risk further damages as a direct result of CFGL's and CFGI's breach.  Any distribution preference in favor of the Club Lenders with respect to Copeinca's assets by virtue of Copeinca's guarantee of the Club Loan was the direct consequence of this breach.

109.    Plaintiffs are therefore entitled to a declaration that the Senior Notes shall share ratably and on a *pari passu* basis with the Club Loan with regard to any and all distributions of Copeinca assets to satisfy the Peruvian OpCos' third-party funded debt obligations.

## THIRD CAUSE OF ACTION

### Tortious Interference With Contract
### Against the Club Loan Agent and Madison Pacific

110.    Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

26

111.    The Indenture is a valid, binding, and enforceable contract.

112.    CFGL is bound by the terms of the Indenture.

113.    The Club Loan Agent knew of the existence of the Indenture and its terms.

114.    With knowledge of the Indenture, the Club Loan Agent intentionally induced CFGL to breach Section 11.01(a) of the Indenture without justification by negotiating and executing the Facility Letter.  But for the interference of the Club Loan Agent, CFGL would have procured the Copeinca Guarantee.

115.    The Club Loan Agent was not exercising any contractual right under the Club Loan Agreement, or seeking to preserve the value of CFGL, when it conditioned funding Copeinca on Copeinca's breach of the Indenture.  Rather, the Club Loan Agent intended to harm the Noteholders for the benefit of the Club Lenders, including the Club Loan Agent.

116.    CFGL breached Section 11.01(a) of the Indenture by failing to procure the Copeinca Guarantee.

117.    Plaintiffs have suffered damages as a direct result of the tortious interference of the Club Loan Agent.

118.    Plaintiffs are entitled to damages against the Club Loan Agent in an amount to be determined at trial.

119.    In addition to damages incurred to date, Plaintiffs risk further damages as a direct result of the tortious interference of the Club Loan Agent and its successor-in-interest, Madison Pacific.  Any distribution preference in favor of the Club Lenders from Copeinca due to the absence of a Copeinca Guarantee was the direct consequence of tortious conduct by the Club Loan Agent.  The Club Lenders should not, in good conscience and equity, be permitted to benefit from the Club Loan Agent's wrongful behavior.

120.    Plaintiffs are therefore entitled to a declaration that the Senior Notes shall share ratably and on a *pari passu* basis with the Club Loan with regard to any and all distributions of Copeinca assets to satisfy the Peruvian OpCos' third-party funded debt obligations.  To the extent the Club Lenders benefit from the Club Loan Agent's misconduct, that benefit should be placed in constructive trust for the benefit of Noteholders.

## FOURTH CAUSE OF ACTION

### Declaratory Judgment Against Copeinca, CFGI and CFGL

121.    Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

122.    An actual controversy exists, which is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, regarding whether Copeinca is liable for amounts owed under the Senior Notes.

123.    CFGI and Copeinca operate as a single, integrated business dominated, manipulated and controlled by the CF Group and CF Group Representatives for the benefit of CFGL (a holding company dependent on the operations of the Peruvian OpCos) and the Ng family (which controls the CF Group).

124.    CFGI and CFGL are bound by the terms of the Indenture, and obligated to pay amounts owed under the Senior Notes.  When CFGI issued the Senior Notes, the Noteholders negotiated express provisions in the Indenture — a parent guarantee from CFGL and assurances of subsidiary guarantees from entities like Copeinca — to ensure that the CF Group could not, through subsequent acquisitions or similar transactions, impair the Noteholders' right to recourse against the CF Group's assets.  The Indenture specifically tasked CFGL, the ultimate parent of the CF Group, with obtaining guarantees from future CFGL subsidiaries.  CFGI, as the issuer of the Senior Notes and a party to the Indenture, is liable for the failure to fulfill the contractual obligation

28

to have Copeinca guarantee the Senior Notes. Instead of complying with these obligations, the CF Group Representatives blocked the issuance of the Copeinca Guarantee and abused Copeinca's corporate form to benefit one set of CF Group creditors (Club Lenders) at the expense of another (Noteholders). Recognizing the corporate independence of Copeinca from CFGI and CFGL with respect to obligations under the Senior Notes would result in injustice against Plaintiffs.

125.    Copeinca is liable for amounts owed under the Senior Notes by CFGI on alter ego grounds because, among other things, the CF Group Representatives operated the Peruvian OpCos as a single, integrated business yet abused Copeinca's corporate form to benefit Club Lenders at the expense of Noteholders.

126.    Copeinca also is liable for amounts owed under the Senior Notes by CFGL on alter ego grounds because, among other things, the CF Group Representatives abused Copeinca's corporate form to cause CFGL to breach its contractual obligation to procure the Copeinca Guarantee.

127.    Accordingly, Plaintiffs are entitled to a declaration that Copeinca is obligated to repay amounts owned under the Senior Notes.

## **FIFTH CAUSE OF ACTION**

### **Declaratory Judgment Against All Defendants**

128.    Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

129.    An actual controversy exists, which is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, regarding how distributions of assets of the Peruvian OpCos should be allocated between Noteholders and Club Lenders.

130.    Distributing the assets of the Peruvian OpCos on a *pari passu* basis between Noteholders and Club Lenders is warranted under the circumstances.  Among other things:

Copeinca's guarantee of the Club Loan and failure to guarantee the Senior Notes each breached the Indenture; the Club Loan Agent, acting for the benefit of the Club Lenders, is the but for cause of Copeinca not guaranteeing the Senior Notes; and both the Indenture and Club Loan Agreement require the equal treatment of all unsecured creditors of the CF Group.

131.    Plaintiffs are therefore entitled to a declaration that Senior Notes shall share ratably and on a *pari passu* basis with the Club Loan on all distributions of assets of the Peruvian OpCos to satisfy the Peruvian OpCos' third-party funded debt obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and grant the following relief:

(i)     Damages in an amount to be determined at trial;

(ii)    An order granting specific performance of CFGL's and CFGI's obligation to procure the Copeinca Guarantee in compliance with Section 11.01(a) of the Indenture;

(iii)   A declaration that the Senior Notes shall share ratably and on a *pari passu* basis with the Club Loan with regard to any and all distributions of Copeinca assets to satisfy the Peruvian OpCos' third-party funded debt obligations;

(iv)    A declaration that Copeinca is obligated to repay amounts owed under the Senior Notes;

(v)     A declaration that the Senior Notes shall share ratably and on a *pari passu* basis with the Club Loan with regard to any and all distributions of the Peruvian OpCos' assets to satisfy the Peruvian OpCos' third-party funded debt obligations;

(vi)    Costs, interest, expenses, and attorneys' fees; and

(vii)   Such other and further relief as this Court deems just and proper.

Dated: June 19, 2020
    New York, New York

               KASOWITZ BENSON TORRES LLP

               By: */s/ Matthew B. Stein*
               Michael A. Hanin (mhanin@kasowitz.com)
               Matthew B. Stein (mstein@kasowitz.com)
               Jill L. Forster (jforster@kasowitz.com)
               1633 Broadway
               New York, New York 10019
               Telephone: (212) 506-1700
               Fax:  (212) 506-1800

               *Attorneys for Plaintiffs*